IN THE UNTED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSEPH PATRICK KELLY, JR.,     )
                                )
           Plaintiff,           )
                                )
v.                              )   No. 12 C 5580
                                )
                                )   Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN, Acting       )
Commissioner of Social Security,[1] )
                                )
           Defendant.           )
                                )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Joseph Kelly moves for reversal and/or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Title II Disability Insurance Benefits ("DIB") (doc. # 22). The Commissioner has filed a cross-motion seeking affirmance of the decision (doc. # 34). For the following reasons, we grant Mr. Kelly's motion and remand the Commissioner's decision.

## I.

Mr. Kelly applied for DIB on November 13, 2009, alleging he became disabled on May 10, 2008, at age 53 (R. 203). After his claim was denied initially and on reconsideration, Mr. Kelly received a hearing before an Administrative Law Judge ("ALJ") on March 23, 2011. After the ALJ issued an opinion denying DIB on April 28, 2011, the Appeals Council declined Mr. Kelly's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-4). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Carolyn W. Colvin for Michael J. Astrue as the named defendant.

[2]On October 24, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. ## 11, 13).

We first summarize the administrative record. Part A reviews Mr. Kelly's physical impairment, Part B reviews his mental impairment, Part C reviews the hearing testimony, and Part D summarizes the ALJ's opinion.

### A.

Mr. Kelly injured his right ankle in May 2006 while doing heavy construction work (R. 37-38). The hospital diagnosed a sprain and prescribed Vicodin (R. 38). Soon afterwards, Mr. Kelly returned to working full-time as a construction superintendent.

However, Mr. Kelly said that by June 2008, he was in so much pain that he lost the motivation and concentration to work (R. 46-47). On June 4, 2008, Mr. Kelly visited podiatrist Monif M. Matouk, D.P.M., complaining of severe ankle pain (R. 355). X-rays taken at the time suggested a chronic tear of a ligament in Mr. Kelly's right ankle, as well as mild degenerative joint changes and calcification (*Id.*). Dr. Matouk recommended supportive shoes, strengthening exercises, elevation, ice and anti-inflammatory medication, and he ordered an MRI, which revealed partial tears in a ligament and tendon in the ankle (R. 356). Dr. Matouk placed Mr. Kelly in a CAM Walker (a removable walking boot), and advised that Mr. Kelly could return to work on modified duty: he was limited to lifting and carrying up to 10 pounds, walking and standing occasionally, and sitting frequently (R. 375).

Between August and December 2008, Dr. Matouk gave Mr. Kelly cortisone injections and prescribed Medrol Dosepak (steroid) and Celebrex (anti-inflammatory) for his pain, and he limited Mr. Kelly to modified duty work: lifting and carrying up to 20 pounds occasionally, standing or walking less than two hours, and sitting frequently (R. 353-54, 376-78). Mr. Kelly received physical therapy from August through November 2008, but his progress was slow and he reported continuing pain (R. 353-54, 365-68). On December 4, 2008, Dr. Matouk opined that

2

Mr. Kelly's improvement had plateaued, and he released Mr. Kelly to work without restrictions (R. 351, 379).

In January 2009, Mr. Kelly reported that he continued to have pain and tenderness in his ankle, but good strength and no instability (R. 395-96). In March through May 2009, Dr. Matouk gave Mr. Kelly several intramuscular injections to his ankle, but injections provided only transient relief; Mr. Kelly continued to complain of pain and weakness particularly when he walked on stairs or uneven ground (R. 349-50, 352). Dr. Matouk restricted Mr. Kelly from all work in April 2009 and renewed this restriction through July 2009 (R. 381, 383-85).

On April 6, 2009, Mr. Kelly was examined by orthopedic surgeon Brian C. Toolan, M.D. (R. 418-23). Mr. Kelly described his pain as sharp, episodic and persistent, and he rated it as a five to six out of ten in intensity (R. 420, 422). Dr. Toolan noted tenderness to palpation, but no swelling or deformity and full strength (*Id.*). He recommended an ankle orthotic instead of surgery and opined that Mr. Kelly could return to light duty work (R. 422-23).

In June and July 2009, Mr. Kelly continued to complain of significant pain and mild swelling (R. 347, 350). Dr. Matouk prescribed Medrol Dosepak and Celebrex, but opined that Mr. Kelly had reached the maximum medical improvement short of surgery. (R. 350, 347). Dr. Matouk ordered that Mr. Kelly undergo a Functional Capacity Evaluation ("FCE") (R. 347), which was performed by physical therapist Anura Bandara on August 19, 2009 (R. 651-93). Mr. Bandera found Mr. Kelly's subjective reports of pain and associated disability to be "both reasonable and reliable" (R. 651). Mr. Kelly rated his ankle pain at a one out of ten before testing, two-and-one-half out of ten after the testing, and five out of ten at its worst over the past thirty days (R. 690). Mr. Bandera opined that testing showed that Mr. Kelly was able to match all the necessary critical job demands to return to full duty as a Construction Superintendent as

3

defined in the Dictionary of Occupational Titles ("DOT") (that is, a job with light physical demand level, which required lifting twenty pounds occasionally and ten pounds frequently, and sitting, standing and walking each up to one-third of the day) (R. 652, 654). Mr. Bandera noted no antalgic gait or altered postures in Mr. Kelly's right ankle but opined that he would benefit from an ankle stabilizer (R. 655).

In September and October 2009, Dr. Matouk stated that Mr. Kelly could return to work as recommended in the FCE, wearing an ankle stabilizer and supportive boots (R. 386, 345-48). However, Dr. Matouk added the restrictions that Mr. Kelly should be able to sit frequently, elevate his right leg and/or apply an ice pack as needed for pain, take pain medications as needed (but no narcotics at the work site), and avoid climbing and walking on uneven surfaces or slopes (R. 346, 388).

On February 3, 2010, Mahesh Shah, M.D., conducted an internal medicine consultative examination of Mr. Kelly for the Bureau of Disability Determination Services ("DDS") (R. 611). At the examination, Dr. Shah noted that Mr. Kelly walked with a limp on the right side and had discomfort while heel and toe walking, but he was able to bear his own weight, did not use an assistive device for ambulation, and was able to get on and off the examining table and go from a sitting to supine position and back again without problems (R. 612-13). Dr. Shah reported that Mr. Kelly had marked tenderness in the right ankle and mild swelling, limited ankle range of motion, and ankle rotations were painful (R. 613-14). Dr. Shah noted that x-rays revealed slightly diminished joint space and mild degenerative changes in Mr. Kelly's right ankle but no definite evidence of fracture or dislocation (R. 616).

On March 15, 2010, state agency medical consultant Charles Wabner completed a physical residual functional capacity ("RFC") assessment for Mr. Kelly after reviewing Dr.

4

Shah's findings and Dr. Matouk's October 2009 opinion (R. 637-38). Dr. Wabner found that Mr. Kelly could perform light work (occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk, or sit about 6 hours in an 8 hour workday), with limited ability to push or pull in right lower extremity and only occasionally climb, balance, stoop, kneel, crouch or crawl (R. 632-33).

**B.**

Mr. Kelly has never seen a psychologist or psychiatrist (R. 49-50), but he reported being depressed at various times between May 2006 and September 2009 to his general practitioner, Octavio Lopez, M.D. (R. 436-47). Dr. Lopez noted that Mr. Kelly reported being depressed at some of their meetings (*see* R. 437, 445), but not all of them (*see* R. 440, 443), and Dr. Lopez consistently renewed Mr. Kelly's prescription for 200 mg of Wellbutrin and 20 mg of Paxil. In November 2008, Mr. Kelly requested an increase in prescription after he was fired from his job, and his Paxil dose was increased to 40 mg (R. 437-38). Dr. Lopez referred to Mr. Kelly's ankle pain once, on September 21, 2009, when Mr. Kelly showed up wearing an air cast (R. 436).

On February 3, 2010, psychiatrist Herman P. Langner, M.D., conducted a psychiatric examination of Mr. Kelly for DDS. Mr. Kelly reported that he isolated himself to avoid being around people, but he could take care of his basic activities of daily living (R. 607-08). Dr. Langner diagnosed him with "Depression NOS [Not Otherwise Specified]" (R. 609). State agency consultant Glen Pittman, M.D., completed a Psychiatric Review Technique on February 25, 2010 based on the medical records from Dr. Lopez and Dr. Langner (R. 629). Dr. Pittman opined that there were only mild limitations in restriction of activities of daily living; difficulties maintaining social functioning; and difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation (R. 627). He determined that Mr. Kelly's impairment of depression NOS was not severe (R. 617, 620).

5

Mr. Kelly also visited internist Mohammed Alawad, M.D., three times between February 22, 2010 and April 2010. While Dr. Alawad noted that Mr. Kelly's depression was "controlled" or "stable" with medication on February 22 and April 14, 2010, he noted that Mr. Kelly was under "much strain" on April 19, 2010 (R. 641-43). Tyrone Hollerauer, Psy.D., reconsidered and affirmed Dr. Pittman's assessment of Mr. Kelly's depression in June 2010 (R. 648-50).

## C.

Mr. Kelly and a VE testified at a hearing before an ALJ on March 23, 2011 (R. 32-82). Mr. Kelly described that on a typical day, he wakes up around 6:00 a.m., watches television and drives to purchase a newspaper from the gas station (R. 41). In the afternoon, he often naps for a few hours, makes dinner if it is easy, and goes to bed by 6:30 p.m. (R. 42). He does very little housework; he may do dishes and grocery shop about once a week, but he never lifts more than 15 pounds (*Id.*). Mr. Kelly stated that if he walks more than 10 to 20 minutes, his ankle starts to ache, and if he stands more than 30 minutes, steps wrong on his ankle or holds his ankle in the same place for more than 30 to 40 minutes, he has to ice it (R. 42-44). He can sit for about 20 minutes before needing to elevate his leg, which eases the pain (R. 43). Mr. Kelly takes Aleve and aspirin multiple times a day for the pain (R. 51). He last took Vicodin in 2008, and he last took Celebrex and received corticosteroid shots in October 2009 (R. 52-53).

Mr. Kelly also testified that he had suffered from depression most of his life (R. 48). It worsened over the past four or five years, to the point that he does not like to leave the house or deal with people (*Id.*). He testified that he never saw a mental health professional because he was a "very private person" (R. 49-50). Mr. Kelly stated that medication helped his depression "some," but he still cannot concentrate enough to finish reading a book or watching a movie, and he becomes frustrated and angry easily (R. 50-51, 54).

6

The VE stated that Mr. Kelly performed his past relevant work as a combination of construction superintendent (skilled, light) and construction worker I (semi-skilled, heavy) under the DOT (R. 66). In the first hypothetical, the ALJ described an individual who could lift and carry 20 pounds; push and pull 50 pounds occasionally; sit and walk one third of a normal workday; never walk on rocky surfaces or slopes, crouch or climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crawl and operate right side foot controls (R. 67-68). The VE testified that this individual would be limited to unskilled, sedentary work (R. 68). However, if the individual would need to elevate his leg three times a day at waist level for half an hour at a time, no jobs would be available (R. 73).

**D.**

In her opinion, the ALJ applied the five-step sequential process, outlined in 20 C.F.R. § 404.1520(a)(4), to determine that Mr. Kelly was not disabled within the meaning of the Social Security Act between his alleged onset date of May 10, 2008 and the date of her opinion, April 28, 2011 (R. 8). At Step 1, the ALJ found that Mr. Kelly had not engaged in substantial gainful activity since his alleged onset date (R. 10). At Step 2, the ALJ found that Mr. Kelly had a severe physical impairment of "mild degenerative joint disease of right ankle," but non-severe depression (R. 11). The ALJ reasoned that Mr. Kelly had never seen a mental health provider or been hospitalized for any mental illness (R. 11-12). She gave "great weight" to the opinions of the state agency examining and non-examining psychiatrists (R. 11, 16). The ALJ found that Mr. Kelly's depression caused no more than mild limitations in the three paragraph B functional areas and no episodes of decompensation because Mr. Kelly completes a "range of daily activities" and pays attention for an average amount of time, although Mr. Kelly and his wife reported that he is afraid to be around people and has difficulty concentrating (R. 11). The ALJ

7

also noted that Mr. Kelly participated in the one and one-half hour hearing "closely and fully without being distracted," and responded to questions in an appropriate manner (R. 16).

At Step 3, the ALJ found that Mr. Kelly's impairments in combination did not meet Listing 1.02 because he was able to ambulate effectively (R. 12). The ALJ then determined that Mr. Kelly had the RFC to perform light work with the use of an ankle brace, limited to frequent pushing or pulling with the right lower extremity and occasional climbing, balancing, stooping, crouching, kneeling or crawling (*Id.*). The ALJ based this RFC on the assessment by non-examining state agency physician Dr. Wabner, while giving "some weight" to the opinion of Dr. Matouk (R. 12-13).[3]

The ALJ reviewed Dr. Matouk's findings and treatment from June 2008 through October 2009, as well as the state agency doctors' and Dr. Alawad's findings (R. 13-14). The ALJ stated that the objective medical record was "fully consistent" with the RFC, as demonstrated by physical examinations showing normal gait and no edema, and no use of an assistive device (R. 16). The ALJ also found that Mr. Kelly was "fairly active" despite his purported pain, as demonstrated by his daily activities, including his ability to do dishes, read the paper, prepare food, clean the house, shop, and drive to the gas station (*Id.*). The ALJ also noted that Mr. Kelly participated in the hearing without any "overt pain behavior" (*Id.*).

The ALJ reviewed Mr. Kelly's testimony, but found that his statements as to the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC (R. 14). The ALJ described Mr. Kelly's treatment history (including taking Aleve and aspirin, receiving Cortisone injections and physical therapy, and elevating and icing his leg) as "routine and conservative" and "effective in controlling [his] symptoms" and pain (R. 15-16). The ALJ also believed there were inconsistencies in Mr.

---

[3] Throughout the opinion, the ALJ incorrectly refers to Dr. Matouk as "Dr. Montauk."

8

Kelly's testimony: he claimed he avoided chores but his wife said he followed instructions; he reported reading the newspaper but later testified that he only read the comics; and his reports on his ability to walk or stand ranged from five minutes to two hours (R. 15). The ALJ also found that Mr. Kelly's testimony as to the severity of his ankle pain was not supported, because at his FCE his pain ranged from one to two-and-one-half on a scale of ten (*Id.*).

The ALJ gave "significant weight" to the opinions of examining (but non-treating) physician, Dr. Toolan, and non-examining state agency physician Dr. Wabner because the ALJ deemed them "consistent" with the RFC and the medical record (R. 16-17). The ALJ gave significant weight to the opinions of Mr. Kelly's treating physician, Dr. Matouk, only with regard to his decision to release Mr. Kelly to work several times, as the ALJ found these opinions consistent with her assessed RFC and the medical evidence of record (R. 17). However, the ALJ "reject[ed]" Dr. Matouk's "particular findings that the claimant should sit frequently, elevate his leg as needed, and apply ice packs," as the ALJ found these findings were inconsistent with Mr. Kelly's reported low level of pain (*Id.*). The ALJ noted that Dr. Matouk accepted the FCE, which added no such restrictions, and the ALJ opined that Dr. Matouk "uncritically accept[ed] as true most, if not all" of Mr. Kelly's subjective reports of symptoms and limitations, whose reliability the ALJ questioned (*Id.*).

The ALJ accorded "great weight" to the FCE, which found that Mr. Kelly could perform the physical demands of his past work as a construction superintendent (R. 17-18). At Step 4, the ALJ relied on the FCE, the state agency physicians' RFC assessments, and "to some extent" Dr. Matouk's assessment, to find that Mr. Kelly could perform his past work as generally performed under the DOT (light, skilled work) (R. 18).

9

## III.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence, which we have described as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, No. 13 C 2964, 2014 WL 3362455, at *5 (7th Cir. July 10, 2014) (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review. A decision that lacks adequate discussion of the issues will be remanded." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (internal citations omitted).

Mr. Kelly argues that the ALJ erred in essentially every part of her decision: at Steps 2, 3, 4, and 5, and in assessing Mr. Kelly's RFC and credibility (doc. # 23: Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 1).[4] We find that while the ALJ's treatment of Mr. Kelly's alleged mental impairment was supported by substantial evidence, errors in the ALJ's treatment of Mr. Kelly's physical impairment require remand.

## A.

As explained above, the ALJ determined that the evidence established that Mr. Kelly suffered from depression, but, after applying the Paragraph B criteria and finding only mild functional limitations and no episodes of decompensation, determined that his mental impairment was not severe. The ALJ noted that Mr. Kelly had never sought treatment from a mental health professional, and his internist who prescribed anti-depressant medication opined

---

[4] Mr. Kelly argues generally that the VE's testimony was based on improper information, and thus, that the ALJ erred in relying on the VE's testimony at Steps 4 and 5 (Pl.'s Mem. at 15); however, as explained above, the ALJ did not reach Step 5 because the ALJ found that Mr. Kelly could perform his past relevant work.

that Mr. Kelly's depression was controlled. The ALJ also noted that Mr. Kelly participated in the hearing "closely and fully without being distracted" and responded to questions in an appropriate manner (R. 16). Thus, Mr. Kelly's argument that the ALJ failed to apply the "special technique" or recognize Mr. Kelly's diagnosis of depression is simply wrong (*see* Pl.'s Mem. at 8-9). The ALJ's determination at Step 2 that Mr. Kelly's mental impairment was not severe was supported by substantial evidence.

### B.

With regard to Mr. Kelly's severe physical impairment (mild degenerative joint disease of the right ankle), the ALJ found that Listing 1.02(A) was not met, and she limited Mr. Kelly's RFC to light work with some additional limitations (R. 11-12). Contrary to Mr. Kelly's arguments, the ALJ sufficiently supported her finding that Mr. Kelly could ambulate effectively and thus did not meet the criteria of Listing 1.02(A) (*see* Pl.'s Mem. at 10-11). An inability to ambulate effectively is defined as "'an extreme limitation of the ability to walk' or a serious interference 'with the individual's ability to independently initiate, sustain, or complete activities.'" *Wurst v. Colvin*, 520 Fed. App'x 485, 488 (7th Cir. 2013) (quoting 20 C.F.R. § 404, Subpt. P, App. 1, § 1.00). The ALJ cited numerous examples in the medical record that demonstrated that Mr. Kelly had a "normal gait," "required no assistive device to walk," and "could carry out activities of daily living," providing sufficient support for her finding that Mr. Kelly's physical impairment did not meet a Listing (R. 16).

### C.

However, the ALJ's assessment of Mr. Kelly's ankle impairment went downhill from there. The ALJ's treatment of the opinions of Mr. Kelly's treating podiatrist, Dr. Matouk, was inconsistent and unsupported. The ALJ gave significant weight to Dr. Matouk's decisions at

11

various points in time to release Mr. Kelly to work because the ALJ found that those opinions were consistent with her assessed RFC. The ALJ otherwise rejected Dr. Matouk's opinions, specifically, his ultimate decision to release Mr. Kelly to work with the added restrictions that Mr. Kelly would be allowed to sit frequently, elevate his leg as needed, and apply ice to his right ankle (R. 16-17).

The ALJ's decision to accept only those opinions of Dr. Matouk that accord with the RFC and reject all others does not meet the Seventh Circuit's requirement that "[w]hen an ALJ chooses to reject a treating physician's opinion, she must provide a sound explanation for the rejection." *Schreiber v. Colvin*, 519 Fed. App'x 951, 959 (7th Cir. 2013). Rather than a sound explanation, the ALJ's explanation mirrored the "meaningless" and "backwardly" language oft-criticized by the Seventh Circuit in the credibility context, where the ALJ states that a claimant's complaints are not credible to the extent they are inconsistent with the RFC. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).

Moreover, in rejecting the bulk of Dr. Matouk's opinions, the ALJ erroneously failed to give any weight to the fact that Dr. Matouk was a podiatrist, a specialist in ankle impairments. *See* 20 C.F.R. § 404.1527(c)(5) (ALJs should "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"). The ALJ also failed to mention that Dr. Matouk at times did not release Mr. Kelly to work and some of the work releases included additional restrictions. As such, the ALJ engaged in "precisely the type of cherry-picking of the medical record that [the Seventh Circuit] ha[s] repeatedly forbidden." *Yurt*, 2014 WL 3362455, at *8. Thus, the ALJ's treatment of Dr. Matouk's opinions was not supported by substantial evidence.

12

**D.**

The ALJ also rejected Dr. Matouk's opinions because she found that he uncritically accepted as true Mr. Kelly's subjective reports of symptoms and limitations, although there were "good reasons for questioning the reliability of the claimant's subjective complaints" (R. 17). However, far from citing "good reasons" for her adverse credibility finding, the ALJ relied on the oft-criticized boilerplate language that Mr. Kelly's statements as to the intensity, persistence and limiting effects of his pain were not credible to the extent they were inconsistent with the RFC. While we will only overturn the ALJ's credibility determination if it is "patently wrong," remand is necessary where an ALJ's credibility determination is based on evidence "cherry-picked from the record, selected without consideration of the context in which they appear." *Bates v. Colvin*, 736 F.3d 1093, 1098-99 (7th Cir. 2013). In attempting to explain this boilerplate, the ALJ again cherry-picked portions of the record that supported her conclusion and misconstrued or misinterpreted some of Mr. Kelly's statements as inconsistent that were not actually inconsistent.

For example, the ALJ rejected Mr. Kelly's frequent complaints of serious pain and concluded that Mr. Kelly's pain treatment was "relatively effective" in controlling his symptoms and pain because Mr. Kelly "reported low pain levels" at his FCE, did not report his pain within 24 hours after the FCE, and relied on "routine and conservative treatment" rather than "invasive procedures" (R. 15-16). This conclusion, however, ignores Mr. Kelly's report at the FCE that his pain had been as high as a five out of ten in the previous month and his consistent reports to Dr. Matouk that his ankle pain continued to be severe and that cortisone shots and oral pain medicine were not effective in controlling his pain. Moreover, the ALJ disregarded the statement by Mr.

13

Bandara, the physical therapist who gave Mr. Kelly the FCE in August 2009, that Mr. Kelly's reports of his pain level were "both reasonable and reliable" (R. 651).[5]

The ALJ's examples of alleged inconsistencies between Mr. Kelly's allegations of pain and his functional limitations also do not provide adequate support for the ALJ's adverse credibility finding. For example, the ALJ stated that Mr. Kelly's testimony that "he stalls all day instead of taking the garbage out" was inconsistent with his wife's "report[] that he followed written and spoken instructions okay" (R. 15). However, Mr. Kelly's unwillingness or inability to take out the garbage does not contradict his ability to understand and follow instructions in general. Similarly, the ALJ accused Mr. Kelly of inconsistency for reporting at a consultative examination that he read the newspaper but testifying at the hearing that he only reads the comics (*Id.*). However, there is no evident contradiction between Mr. Kelly's statement that he reads the newspaper and his description of the particular portions of the newspaper he reads.

"We decline to defer to credibility determinations when, as here, the ALJ relies heavily on the kind of meaningless boilerplate and commits several analytical errors when assessing the record." *Schmidt v. Colvin*, 545 Fed. App'x 552, 555 (7th Cir. 2013). Here, the ALJ ignored evidence of Mr. Kelly's reports of severe pain, misinterpreted some of Mr. Kelly's testimony as inconsistent, and misconstrued the effectiveness and invasiveness of the multiple pain treatments Mr. Kelly received. Thus, we find that the ALJ's credibility determination was not supported by substantial evidence. *See also Murphy v. Colvin*, No. 13 C 3154, 2014 WL 3586260, at *3 (7th

---

[5]The ALJ's attempt to discredit Mr. Kelly based on his varying reports of pain levels is problematic. The ALJ stated that Mr. Kelly's reports of pain and functional limitations were not credible because they worsened considerably from August and November 2009 to June 2010: in 2009, Mr. Kelly reported that he could be on his feet up to 2 hours, but in 2010, he reported that he could walk for only 5 minutes and could not be on his feet for more than 10 minutes (R. 15). The ALJ did not explain how she found that Mr. Kelly complained of only a low level of pain when even at his best during this time period, he alleged that he could only be on his feet up to 2 hours. Moreover, the Seventh Circuit recently held that an ALJ errs by failing to consider the progressive nature of a claimant's physical impairment and the "waxing and waning" of the claimant's symptoms over time. *Scrogham v. Colvin*, No. 13 C 3601, 2014 4211051, at *8-9 (7th Cir. Aug. 27, 2014).

Cir. July 22, 2014) (remanding where ALJ did not adequately explain her credibility determination).

Because we remand on the grounds stated above, we need not address the remaining challenges that Mr. Kelly raises. Upon remand, however, the ALJ should reassess Mr. Kelly's RFC and the subsequent Steps 4 and 5 analyses after revisiting the weight to attribute to Dr. Matouk's opinions and after a new evaluation of Mr. Kelly's credibility.

## CONCLUSION

For the reasons stated above, we grant Mr. Kelly's motion to remand the ALJ's decision (doc. # 22), and deny the Commissioner's motion to affirm (doc. # 34). The case is terminated.[6]

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: September 3, 2014

---

[6] We reject Mr. Kelly's alternative request for reversal and an award of benefits. We leave that determination in the first instance to the ALJ on remand.

15